# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-00032-01-CR-W-DGK |
| | ) | |
| | ) | |
| STANFORD C. GRISWOLD, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending are Defendant Stanford Griswold's pro se Motion to Suppress filed February 22, 2022, pro se Motion to Dismiss Statements filed March 21, 2022, and pro se Motion to Dismiss Charges filed May 2, 2022. Docs. 84, 93, 100. The Government filed Suggestions in Opposition on March 14, 2022, and April 1, 2022.[1] Docs. 91, 95. Defendant filed replies to his Motion to Suppress and his Motion to Dismiss Statements on April 4, 2022 and May 23, 2022, respectively.[2] Docs. 96, 106. For the reasons set forth below, it is recommended that Defendant's Motion to Suppress and Motions to Dismiss be **DENIED**.

## I. BACKGROUND

Defendant was initially charged by Criminal Complaint filed on January 22, 2019, with being a felon in possession of a firearm. Doc. 1. On the same date, the Federal Public Defender's

---

[1] The Government did not file a response to Defendant's Motion to Dismiss Charges (Doc. 100), and the time for doing so has passed. *See* L.R. 7(c)(3).

[2] Defendant requested and was granted additional time to file a reply in support of his Motion to Dismiss Statements (Doc. 93). Docs. 98-99. His reply was due April 29, 2022, which was the deadline Defendant requested. *Id.* No reply was filed. At the suppression hearing held on May 5, 2022, Defendant requested and was granted until May 12, 2022 to file his reply. *See* Doc. 103. Despite being granted two extensions of time, Defendant's Reply to his Motion to Dismiss Statements was not filed until May 23, 2022 – eleven days after the deadline set by the Court. *See id*; *see also* Doc. 106. The Court also observes that Defendant's Reply was filed in the Court's CM/ECF system as a motion to dismiss; however, as best the Court can discern, Defendant's filing does not seek any unique relief. Thus, the Court construes Defendant's May 23, 2022 filing as a reply to his Motion to Dismiss Statements.

Office was appointed to represent him.[3]  Doc. 5.  On February 26, 2020, the grand jury returned a superseding indictment charging Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); possession with intent to distribute PCP (phencyclidine) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A); and possession of marijuana in violation of 21 U.S.C. § 844(a).[4]  Doc. 25.

In January 2021, Steve Moss, Assistant Public Defender, entered his appearance on Defendant's behalf.  Doc. 43.  Approximately one month later, Defendant requested the appointment of substitute counsel.  Doc. 46.  After conducting an attorney appointment hearing on March 11, 2021, the Court granted Defendant's motion and appointed Dione Greene to represent Defendant.  Docs. 48, 50.  On August 19, 2021, Mr. Greene moved to withdraw.  Doc. 53.  On August 26, 2021, during the scheduled pretrial conference for the September 20, 2021 trial setting, Defendant requested to proceed pro se.  Docs. 55, 57.  After holding a *Faretta* hearing, the undersigned found Defendant knowingly and voluntarily waived his right to counsel and granted Defendant's request to proceed pro se.  Doc. 56.  The undersigned denied Defendant's oral motion to continue the September 20, 2021 trial setting and advised that any motion to continue should be filed in writing.  Doc. 55.

On September 7, 2021, this matter was assigned to District Judge Stephen R. Bough for a jury trial to commence on September 27, 2021.  *See* Doc. 68.  Shortly thereafter, Defendant filed a written pro se motion to continue.  Doc. 71.  On September 20, 2021, Judge Bough held a pretrial

---

[3] Assistant Public Defender Carie Allen initially represented Defendant.  *See* Docs. 5, 14.

[4] The original indictment was returned on January 25, 2019, and charged Defendant with being a felon in possession of a firearm; possession with intent to distribute phencyclidine; and possession of a firearm in furtherance of a narcotics offense.  *See* Doc. 8.

conference during which he granted Defendant's motion to continue. Doc. 74. Defendant also asked to file a motion to suppress out of time, and Judge Bough ordered any such motion be filed within thirty days.[5] *Id*.

The undersigned held a status conference on September 23, 2021. Doc. 77. During the hearing, Defendant orally requested an additional period of 90 days to file his pretrial motions. Docs. 77-78. The undersigned granted his request in-part, establishing a new deadline of November 22, 2021 for Defendant to seek to file pretrial motions out-of-time. *Id*.

On February 22, 2022, which was 92 days after the amended motions deadline, Defendant filed his pro se Motion to Suppress seeking to suppress any evidence obtained from the search of his person and vehicle on or about January 20, 2019. Doc. 84. Defendant alleges his encounter with law enforcement violated his "[F]ourth Amendment & [F]ourthteenth [sic] Amendment – Illegal stop – Illegal search & seizure exceedit [sic] to a[n] Illegal Terry Stop – No Reasonable Suspicion of A Criminal Activity Afoot – Unlawful invasion – Unlawful Search & Seizure of [his] Person, Place, and Things Unlawfully Obtained as fruit's [sic] of the poisonest [sic] tree." *Id.* at 5.

On March 21, 2022, which was 119 days after the Court's amended deadline, Defendant filed his Motion to Dismiss Statements. Doc. 93. Although titled "Motion to Dismiss," the motion seeks suppression of statements Defendant made to law enforcement after his arrest. *See id*. Specifically, Defendant argues his post-arrest statements should be suppressed because they were obtained in violation of his "Fifth Amendment Rights." *Id*. at 1. He states he was "under the influence of such [a] powerfull [sic] drug (PCP)," and "NO-ONE [sic] should be Questioned in a[n] Interview while under the influence of such [a] powerfull [sic] drug." *Id*.

---

[5] The original deadline for filing pretrial motions was August 2, 2019. Doc. 16 at 9.

On May 2, 2022, which was 161 days after the Court's amended deadline, Defendant filed his Motion to Dismiss Charges. Doc. 100. Therein, Defendant argues "Evidence Used to Support the Accusatory instrument was illegally obtained after violating [his] [F]ourth Amendment, as well as [his] [F]ourtheenth [sic] Amendment Constitutional Right's [sic]." *Id*. at 1. He also maintains "the Government gave false Evidence to the Court's [sic] that caused the Defendant to be charged with count 2 & 3 because of the false weight amount of the PCP that was wrongfully waved [sic] & wrongfully presented to the Court's [sic], which is considered a lie to the Grand jury just to add Extra Count's [sic], when the Defendant['s] initial charge's [sic] was [sic] only one count." *Id*. at 2.

On May 5, 2022, the undersigned held an evidentiary hearing on Defendant's Motion to Suppress and Motion to Dismiss Statements. Doc. 103. Mr. Griswold was present and represented himself pro se. His standby counsel, Mark Thomason, was also present. The Government was present and represented by Assistant United States Attorneys Trey Alford and Kenneth Borgnino. At the evidentiary hearing, three witnesses testified: (1) John Mogilnicki, (2) Luke Little, and (3) James Manley. Additionally, twenty-two exhibits were admitted into evidence. *See* Doc. 104.

## II.    FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

1.      For approximately twenty years, John Mogilnicki has been an officer with the Kansas City Police Department ("KCPD"). Tr. at 8-9, 41-42.[6] He is currently assigned to South Patrol, and his primary duties include responding to calls requesting police assistance, otherwise known as calls for service. Tr. at 9.

---

[6] "Tr." refers to the Transcript of Hearing on Motions to Suppress Evidence and Statements. Doc. 105.

2.      Shortly before 2:00 p.m. on January 20, 2019, Officer Mogilnicki responded to a call for service regarding an individual who appeared to be passed out in a vehicle in the left turn lane at the intersection of Red Bridge and Grandview Road in Kansas City, Missouri.  Tr. at 9-11, 36, 41.  Upon arrival, he observed a silver Buick stopped in the left turn lane that was still running, with the left turn signal and brake illuminated.  Tr. at 11, 15, 38; Gov't Ex. 1 at 1:49:40 – 1:50:02 p.m.[7]  The officer observed another vehicle in front of the Buick, and a female was standing outside of that vehicle.  Tr. at 11-12; Gov't Ex. 1 at 1:50:02 p.m.

3.      Officer Mogilnicki pulled his vehicle behind the silver Buick, exited, and spoke with the female standing outside the other vehicle.  Tr. at 11-12, 16; Gov't Ex. 1 at 1:50:04 – 1:50:30 p.m.  The female informed Officer Mogilnicki that she believed a person in the Buick was unconscious and possibly needed medical attention.  Tr. at 12.  Officer Mogilnicki asked her to move her vehicle out of the way in case the driver became alert and attempted to drive away.  Tr. at 12, 35; Gov't Ex. 1 at 1:50:38 p.m.

4.      When Officer Mogilnicki approached the Buick, he smelled the odor of marijuana coming from the vehicle[8] and observed the individual sitting in the driver's seat appeared to be unconscious.  Tr. at 12, 35, 37-38, 43; Gov't Ex. 1 at 1:50:33 – 1:50:37 p.m.  He also saw a soda can with ashy residue and a passenger who also appeared unconscious.  Tr. at 12, 14-15, 39.

5.      Officer Mogilnicki initially believed the Buick's occupants may be under the influence or suffering from a medical emergency.[9]  Tr. at 14-15, 24-25, 41, 45.  Further, based on

---

[7] Government Exhibits 1 and 2 are the responding officers' dashcam videos on January 20, 2019.  At the suppression hearing, the Government also admitted excerpts from said videos as separate exhibits (i.e., Gov't Exs. 4-7, 9-15). Because the time stamps reflect identical times on all exhibits, the undersigned will only cite the complete videos.

[8] During his twenty years in law enforcement, Officer Mogilnicki has encountered marijuana "close to" 1,000 times. *See* Tr. at 12-13.  As such, he is familiar with the odor of marijuana.  *Id.*

[9] According to Officer Mogilnicki, if a driver appeared to be under the influence, he would investigate, and if the individual needs medical assistance, he must provide aid.  Tr. at 14-15, 45.

the odor of marijuana, Officer Mogilnicki believed he had probable cause to search the vehicle at that time. Tr. at 13, 37-38, 43-44. Accordingly, he requested assistance from another officer. Tr. at 13, 37-38, 43-44; Gov't Ex. 1 at 1:52:47 – 1:52:52 p.m.

6.     Luke Little, who recently retired from KCPD after serving twenty-five years as an officer, arrived on the scene and parked his patrol vehicle in front of the Buick.[10] Tr. at 13-14, 16, 47-50; Gov't Exs. 1 and 2 at 1:55:29 – 1:55:39 p.m. As Officer Little approached the running vehicle, Officer Mogilnicki informed him that the vehicle's two occupants appeared to be passed out. Tr. at 14, 25, 51-53; Gov't Exs. 1 and 2 at 1:55:45 – 1:55:52 p.m. Officer Little confirmed there were no children in the vehicle, the occupants were passed out but appeared to be breathing, and they did not appear to have been involved in a violent crime (i.e., he did not observe bullet holes).[11] Tr. at 25, 51-52; Gov't Exs. 1 and 2 at 1:55:52 – 1:56:08 p.m. At this point, Officer Little believed there was probable cause to investigate the scene as a potential DUI. Tr. at 53.

7.     Officer Little instructed Officer Mogilnicki to move his patrol vehicle closer to the Buick to prevent the driver, who may be impaired, from attempting to drive away. Tr. at 14-16, 25, 35, 41, 50-51, 78-79; Gov't Exs. 1 and 2 at 1:56:04 – 1:56:06 p.m. After Officer Mogilnicki moved his patrol vehicle within inches of the Buick, Officer Little positioned himself outside the passenger's window, and Officer Mogilnicki stood by the driver's window. Tr. at 16-17, 25, 53, 64; Gov't Exs. 1 and 2 at 1:56:40 p.m.

8.     Officer Mogilnicki attempted to wake the Buick's occupants by tapping on the vehicle's window with his police baton. Tr. at 14, 16-17, 25, 53; Gov't Exs. 1 and 2 at 1:56:42 –

---

[10] According to Officers Little and Mogilnicki, parking vehicles behind and in front of another's car prevents mobility of the vehicle and ensures the safety of the public and the officers. Tr. at 15-16, 35, 50-51.

[11] Based on his experience, Officer Little believed that since both occupants were passed out, they were likely impaired in some fashion. Tr. at 52-53, 79, 86.

1:56:52 p.m.  According to Officer Mogilnicki, the driver, later identified as Defendant, suddenly woke up.  Tr. at 17, 57, 96-97.  Once Defendant was awake, Officer Mogilnicki believed he had probable cause that Defendant was operating a motor vehicle while under the influence of a controlled substance.  Tr. at 43.

9.      Immediately after waking, Defendant grabbed the steering wheel with his left hand and reached for the gear shifter with his right hand.  Tr. at 17, 19-20, 25, 40-41, 54, 65. Simultaneously, the officers removed their weapons and commanded Defendant to "put the car in park" and "stop the car," but Defendant did not comply.  Tr. at 17, 54-56, 80, 82; Gov't Exs. 1 and 2 at 1:56:53 – 1:57:20 p.m.  He drove his vehicle forward, hitting Officer Little's patrol vehicle. Tr. at 25, 41, 54, 64, 82, 84; Gov't Exs. 1 and 2 at 1:56:50 – 1:56:55 p.m.

10.     The passenger, later identified as Gregory Love, lowered his window, and Officer Little reached inside to open the door.  Tr. at 18, 42, 54-55, 64; Gov't Exs. 1 and 2 at 1:57:12 - 1:57:22 p.m.  Officer Little opened the passenger door, removed Mr. Love from the vehicle, and requested Officer Mogilnicki's assistance with securing Mr. Love.  Tr. at 18, 55, 64; Gov't Exs. 1 and 2 at 1:57:22 – 1:57:30 p.m.

11.     Defendant then placed his vehicle in reverse and collided with Officer Mogilnicki's patrol vehicle.  Tr. at 18, 25, 40, 43, 64, 84; Gov't Exs. 1 and 2 at 1:57:25 – 1:57:28 p.m.  Based on Defendant's attempts to drive forward and in reverse, the officers also believed Defendant was attempting to elude or flee.  Tr. at 41, 54.  Officers Mogilnicki and Little believed Defendant's acts of striking both patrol cars gave the officers additional probable cause to arrest Defendant.  Tr. at 43-44, 54.

12.     While Officer Mogilnicki detained Mr. Love, Officer Little entered the Buick's front passenger compartment, shifted it out of gear, and turned off the motor. [12]  Tr. at 18-19, 55-56, 64; Gov't Exs. 1 and 2 at 1:57:24-28 p.m.  Once he was in the vehicle, Officer Little observed a large black handgun between the console and the seat, wedged next to Defendant's right leg.  Tr. at 56, 64-65, 88-89.  Because of concerns that Defendant may reach for the weapon, Officer Little pinned Defendant against the side of the vehicle, pressed his duty weapon against him, and instructed Defendant not to reach for the weapon.  Tr. at 19, 55-58; Gov't Ex. 2 at 1:57:40 – 1:57:42 p.m.

13.     Officer Mogilnicki called for additional officer assistance.  Tr. at 19.  Officer Mike McClure arrived in a patrol wagon and immediately began assisting Officer Little.  Tr. at 19, 58; Gov't Exs. 1 and 2 at 1:58:21 p.m.  Officers Little and McClure took Defendant out of the vehicle through the driver's side door and handcuffed him.  Tr. at 19, 26, 58; Gov't Exs. 1 and 2 at 1:59:29 – 1:59:50 p.m.

14.     When the officers searched Defendant's person incident to arrest, they discovered a bottle of phencyclidine[13] hidden in his buttocks.[14]  Tr. at 20, 32-33, 59-62, 73-74; Gov't Ex. 2 at 2:00:36 – 2:00:43 p.m.; Gov't Ex. 19.  The officers also discovered a pack of "More" brand cigarettes and a bag of green leafy substance on Defendant's person.  Tr. at 21, 59, 61, 65; *see* Gov't Ex. 2 at 2:00:00 – 2:00:10 p.m.  During their search of his person, law enforcement attempted to determine if Defendant was a felon.[15]  Gov't Ex. 2 at 2:02:38 – 2:02:48 p.m.

---

[12] Officer Little was unsure of the order of events related to shutting the vehicle off and "kick[ing] it out of gear."  Tr. at 55-56.

[13] Phencyclidine ("PCP") is typically ingested by dipping a "More" brand cigarette into a container of PCP and then smoking the cigarette.  Tr. at 20-21, 61, 74, 112-13.

[14] Officer Little testified Defendant's "butt cheeks [were] clenched hard," which is usually an indication someone is hiding or concealing contraband in their rectum.  Tr. at 60.

[15] An officer asked Defendant, "You a felon, man?"  Gov't Ex. 2 at 2:02:38 – 2:02:48 p.m.  No response is heard, and after approximately two seconds, another officer says, "That long pause is probably a yes."  *Id*.

15.     The officers testified they towed Defendant's vehicle for three reasons: (1) an investigative hold was placed on the vehicle, (2) the vehicle was illegally parked, and (3) Defendant was arrested.  Tr. at 27-30, 45, 68, 70-72; Gov't Ex. 8.  According to KCPD's tow policy, an inventory search was conducted of Defendant's vehicle, and a firearm was recovered.  Tr. at 27-29, 31-32, 68-71; Gov't Exs. 8 and 17.  No warrant was obtained to search Defendant's vehicle.  Tr. at 42-43.

16.     Because officers recovered PCP and believed Defendant may have ingested the same, emergency medical services transported Defendant to Research Medical Center.  Tr. at 33, 74.  After observation and evaluation, hospital staff cleared Defendant's health and released him to law enforcement.  Tr. at 33-34, 96.

17.     Defendant was transported to the Metro Patrol Station.  Tr. at 34.  At approximately 4:51 p.m., Defendant was escorted to a room to be interviewed, seated in a chair at a table, and was not physically restrained.  Gov't Ex. 24 at 16:51:40-45 p.m.  James Manley, a KCPD detective with over twenty years of experience, interviewed Defendant. Tr. at 34, 93-94, 96.

18.     Prior to the interview, Detective Manley presented Defendant with KCPD's "Miranda Warning and Waiver" form.  Tr. at 97-99; Gov't Ex. 22; Gov't Ex. 24 at 16:52:01 – 16:52:10 p.m.  The detective asked Defendant if he would like to read the form aloud, or if he preferred to have the form read to him.  Tr. at 97; Gov't Ex. 24 at 16:56:38 – 16:56:42 p.m.  Either way, the detective explained it was necessary that Defendant understand his rights.  Tr. at 97, 99; Gov't Ex. 24 at 16:56:42 – 16:56:45 p.m.  Defendant asked Detective Manley to read the form aloud.  Tr. at 97; Gov't Ex. 22; Gov't Ex. 24 at 16:56:46 – 16:56:56 p.m.  Before Detective Manley began reading the form, a copy of the form was placed in front of Defendant allowing him to follow along or read it on his own.  Tr. at 97, 101; Gov't Ex. 24 at 16:56:56 p.m.

19.     Detective Manley read the entire form to Defendant.  Tr. at 97-99; Gov't Ex. 24 at 16:56:56 – 16:57:15 p.m.  After being apprised of his *Miranda* rights, Detective Manley asked Defendant if he understood his rights. Tr. at 99; Gov't Ex. 24 at 16:57:15 – 16:57:32 p.m.  The detective asked Defendant if he wanted to sign the waiver but also advised Defendant he was not required to do so.  Gov't Ex. 24 at 16:57:34 – 16:57:36, 16:57:48 – 16:57:53 p.m.

20.     Defendant twice told Detective Manley that he understood his rights, and Defendant signed the waiver acknowledging and waiving his *Miranda* rights.  Tr. at 98-99; Gov't Ex. 22; Gov't Ex. 24 at 16:57:24 – 16:57:28, 16:57:4 – 16:57:47, 16:58:09 – 16:58:32 p.m.  Defendant told Detective Manley that his highest education level was "some college," which was transcribed on the waiver form.  Tr. at 100-01; Gov't Ex. 22; Gov't Ex. 24 at 16:56:26 – 16:56:30, 16:58:51 – 16:58:55 p.m.

21.     After signing the waiver, Defendant spoke with Detective Manley.  Tr. at 101; *see* Gov't Exs. 24-25.  According to Detective Manley, Defendant appeared "calm, lucid, and conversational" and seemed to understand what was going on.  Tr. at 101-02, 115.  Defendant responded and spoke clearly to questions, did not slur his words, was conversational, and at times, responded with questions.  Tr. at 102-03; Gov't Exs. 24-25.

22.     Detective Manley observed Defendant's eyes were not dilated, he was not sweating, and "he appeared to be with his wits." Tr. at 102, 112.  Defendant was able to articulate identifying information such as his address, his social security number, his mother's name, as well as different phone numbers and addresses.  Tr. at 102; Gov't Ex. 24 at 16:59:18 – 16:59:55 p.m.  According to Detective Manley, Defendant did not appear to be under the influence of PCP.[16]  Tr. at 112.

---

[16] Based on his training and experience, Detective Manley testified that individuals who are under the influence of PCP are often highly agitated, profusely sweating, violent, and, at times, cannot make coherent sentences.  Tr. at 112.

When asked, Defendant informed Detective Manley that he was not under the influence of PCP and had not consumed PCP since 2003. Tr. at 112; Gov't Ex. 24 at 17:13:23 – 17:13:28 p.m.

23.     During the interview, Detective Manley asked Defendant if he would consent to a buccal swab. Tr. at 104-05; Gov't Ex. 24 at 17:04:12 – 17:04:18 p.m. When presented with the consent form, Defendant advised Detective Manley that his DNA was already on file from a past incarceration.[17] Tr. at 105; Gov't Ex. 24 at 17:05:26 – 17:05:38 p.m. Nevertheless, Defendant signed the consent form, and a buccal swab of his cheeks was conducted. Tr. at 104-05, 107-08; Gov't Ex. 23; Gov't Ex. 24 at 17:05:58 – 17:06:30 p.m.

24.     Defendant's initial interview concluded after approximately twenty-three minutes. Gov't Ex. 24 at 17:14:05 p.m. At Defendant's request, he and Detective Manley resumed the interview approximately fifteen minutes later. Tr. at 109; Gov't Ex. 24 at 15:30:35 p.m.; Gov't Ex. 25. The continuation of the interview lasted less than two minutes. Gov't Ex. 24 at 15:30:36 – 15:32:21 p.m.; Gov't Ex. 25. Again, Defendant's speech appeared clear, his thoughts were articulate, and he appeared to understand what was going on during both interview sessions. *See id*.

### III.     DISCUSSION

**A.     Timeliness of the Motions**

Pursuant to the Federal Rules of Criminal Procedure, pretrial motions must be filed before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(C). A district court has the authority to

---

[17] More specifically, Defendant informed Detective Manley that he was convicted in the late 2000s for assaulting a federal agent. Tr. at 106. While discussing his conviction, Defendant referred to the federal operation – Operation Falcon. *Id*. When asked about the circumstances surrounding his conviction, Defendant said he was in the wrong place, at the wrong time. *Id*. According to Detective Manley, Defendant's discussion about his prior felony conviction demonstrated Defendant's ability to recall information. *Id*.

set a deadline for pretrial motions. Fed. R. Crim. P. 12(c)(1). The Court may consider, at its discretion, untimely pretrial motions "if the party shows good cause" for the delay. Fed. R. Crim. P. 12(c)(3); *see also United States v. Reichel*, 911 F.3d 910, 916 (8th Cir. 2018); *United States v. Trancheff*, 633 F.3d 696, 697 (8th Cir. 2011). To show "good cause," the movant bears the burden of showing "both cause and prejudice." *United States v. Fogg*, 922 F.3d 389, 391 (8th Cir. 2019).

Defendant's three pro se motions were filed well after the November 22, 2021 deadline which was reset after hearings before Judge Bough and the undersigned. Defendant styled his motion to suppress as a "motion for leave" and generally averred he missed the November 22, 2021 deadline because he had been transferred to another jail facility, he was unable to go to the law library, and was unable to contact his standby counsel. Doc. 84 at 1.[18] These general averments are not sufficient to meet the standards for showing sufficient cause for filing untimely motions. Defendant's motion to dismiss statements and the motion to dismiss charges, which were filed even later than the original motion to suppress, also do not aver sufficient cause for filing untimely motions under Rule 12(c)(3) and prevailing Eighth Circuit standards.[19]

Accordingly, the undersigned recommends denial of Defendant's motion to suppress, motion to dismiss statements and motion to dismiss charges as being untimely filed.

---

[18] Defendant did not include any details surrounding the dates he was transferred to another facility, the dates he sought access to the law library or legal materials, or the dates he attempted to contact standby counsel. He failed to provide any evidence that he either requested access to the law library or pursued administrative remedies concerning same. He did not file any written motions with this Court seeking an extension of the motions deadline on the grounds he now provides in the motion to suppress.

[19] Defendant also cannot argue the substitution of appointed counsel and his later election to proceed pro se provided good cause for the filing of untimely motions. The Eighth Circuit has held the appointment of new counsel does not constitute good cause for filing an untimely motion. *United States v. Dabney*, ___ F.4th ___, 2022 WL 3051644, at *3 (8th Cir. Aug. 3, 2022); *Trancheff*, 633 F.3d at 698. The same rule should apply when a defendant elects to proceed pro se after being represented by multiple court-appointed attorneys. Further, it appears the only reason Defendant elected to proceed pro se in this case was "to get my motions in and to get a suppression hearing to be heard." Doc. 105 at 141. If true, his election to proceed pro se was an effort to circumvent the original motion deadline and to pursue pretrial motions that court-appointed counsel did not pursue.

Notwithstanding the timeliness ruling, the undersigned has also made recommendations concerning the merits of each motion below.

**B.      Motion to Suppress Evidence**

Defendant contends law enforcement did not have reasonable suspicion that criminal activity was afoot when they first approached his vehicle after receiving a call for service. The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…" U.S. Const. amend. IV. To protect citizens from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a judicial search warrant based on probable cause before searching private property. *See*, *e.g.*, *Shade v. City of Farmington*, 309 F.3d 1054, 1059 (8th Cir. 2002). The United States Supreme Court has held "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

**1.      Reasonable Suspicion[20]**

The Fourth Amendment permits brief investigative stops when law enforcement has a particularized and objective basis for suspecting the person stopped is, or is about to be, engaged in criminal activity. *See United States v. Cortez*, 449 U.S. 411, 417 (1981) (citations omitted); *Terry v. Ohio*, 392 U.S. 1, 27-31 (1968); *see also United States v. Slater*, 979 F.3d 626, 629 (8th

---

[20] The Government argues law enforcement acted properly under their community caretaking function. Doc. 91 at 5-6. However, because the undersigned recommends a finding that the officers' reasonable suspicion justified the initial encounter, whether or not the officers were also acting within their community caretaking function is not addressed.

Cir. 2020) (acknowledging an officer must have reasonable suspicion that criminal activity may be afoot for a *Terry* stop).

Reasonable suspicion does not require "absolute[] certain[ty];" instead, an officer must observe "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *United States v. Lawhorn*, 735 F.3d 817, 821 (8th Cir. 2013) (quoting *Terry*, 392 U.S. at 27). Although the reasonable suspicion standard is somewhat abstract and requires more than a mere hunch, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Sanchez*, 955 F.3d 669, 674-75 (8th Cir. 2020) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *see also Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (observing reasonable suspicion is a "less demanding" standard, and thus, "can be established with information that is different in quantity or content than that required to establish probable cause.") (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

To assess whether an officer had reasonable suspicion based on specific, articulable facts, courts "look at the totality of the circumstances, allowing officers to draw on their experience and training." *Lawhorn*, 735 F.3d at 820 (citing *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008)); *see also Arvizu*, 534 U.S. at 273 (recognizing reasonable suspicion allows officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them"). A court will consider what the officer reasonably knew at the time of the stop "rather than assessing the existence of reasonable suspicion 'with the vision of hindsight.'" *Slater*, 979 F.3d at 629 (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)).

Here, Officer Mogilnicki was dispatched to an intersection for a call for service regarding an individual who appeared to be unconscious in a vehicle at an intersection. Upon arrival, he observed a silver Buick stopped at the intersection that was running, with exhaust flowing from the tailpipe, and its left turn signal and brake lights activated. Officer Mogilnicki looked inside the vehicle and observed two individuals who appeared to be passed out and a soda can with an ashy residue on the top. He also detected the odor of marijuana. Based on his training and experience, the officer believed the driver may have been under the influence while operating a motor vehicle, which is a crime in Missouri.[21]

Officer Little reached the same conclusion upon his arrival at the scene. Prior to contacting the occupants of the vehicle, he observed them to be breathing but passed out with no evidence that suggested either person had been involved in a violent crime. Based on his experience and his observations, he believed the likelihood of a medical emergency was remote and suspected the driver was impaired which violated the law and created a dangerous situation since the vehicle was still running and located in an intersection.

Based on the totality of the circumstances, law enforcement officers had a reasonable, articulable suspicion that the driver of the vehicle was committing, or was about to commit, a crime, of driving under the influence. The undersigned recommends a finding that the Government has met its burden of establishing Officers Mogilnicki and Little had a reasonable suspicion criminal activity was afoot based on the totality of the circumstances, thus justifying the initial encounter with Defendant.

---

[21] *See* Mo. Rev. Stat. §§ 577.001(13), 577.010.

## 2.    Search Incident to Lawful Arrest

"Among the exceptions to the warrant requirement is a search incident to a lawful arrest." *Gant*, 556 U.S. at 338. A warrantless arrest does not violate the Fourth Amendment if it is supported by probable cause. *Royster v. Nichols*, 698 F.3d 681, 687-88 (8th Cir. 2012). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation and quotation marks omitted). Because "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts," it cannot be "readily, or even usefully, reduced to a neat set of legal rules." *See id.* at 370-71 (citation omitted). Notably, probable cause is not a "high bar." *District of Columbia v. Wesby,* 138 S. Ct. 577, 586 (2018); *United States v. Edwards,* 891 F.3d 708, 711 (8th Cir. 2018).

To determine whether an officer had probable cause for an arrest, a reviewing court looks at the totality of the circumstances based on the information available to the officers at the time of the arrest. *United States v. Kelly*, 329 F.3d 624, 628 (8th Cir. 2003). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Chappell*, 779 F.3d 872, 877 (8th Cir. 2015) (quoting *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007)). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013) (citation omitted). "Instead, the mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that

is required." *Id.* (citation and quotation marks omitted). "Law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (citations and quotation marks omitted).

In the instant matter, officers reasonably believed Defendant was driving under the influence. Prior to contacting the vehicle's occupants, the officers observed the driver and the passenger appeared to be passed out. The running vehicle was in the middle of a turn lane with the brake light and turn signal illuminated. Officer Mogilnicki also smelled the odor of marijuana. When the officers' contacted the driver and gave instructions to stop the vehicle or place it in park, he suddenly woke up and hit the patrol car parked in front of his vehicle. Defendant then placed the car in reverse and struck the patrol car parked behind his vehicle. At this point, the officers reasonably believed Defendant was attempting to elude or flee the scene.

Officer Little entered the vehicle to attempt to turn it off and observed a black firearm between the console and the driver's seat. Officers placed Defendant in handcuffs, and during their search of his person, discovered a green leafy substance and a small vile of a substance believed to PCP. Based on the totality of the circumstances, the facts are sufficient to lead a reasonable person to believe that Defendant had committed or was committing the crimes of driving while intoxicated and attempting to flee the scene or elude officers. Accordingly, the undersigned recommends a finding that the officers' search of Defendant's person incident to arrest was supported by probable cause.

### 3. Search of Defendant's Vehicle

#### a. Inventory Search

"It is well-settled law that a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their

contents within police custody." *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) (citation and quotation marks omitted). Furthermore, the Eighth Circuit has found an inventory search to be reasonable "if it is conducted according to standardized police procedures" because doing so "vitiate[s] concerns of an investigatory motive or excessive discretion." *United States v. Green*, 929 F.3d 989, 992 (8th Cir. 2019) (citation and quotation marks omitted). Inventorying the contents of a vehicle in law enforcement's custody protects (1) the vehicle owner's property while the vehicle is law enforcement's custody, (2) law enforcement with regard to claims or disputes as to lost or stolen property, and (3) law enforcement from potential danger. *United States v. Hall*, 497 F.3d 846, 850 (8th Cir. 2007) (citation omitted).

The KCPD tow policy permits officers to tow vehicles that are illegally parked, when an investigative hold is placed on a vehicle, or when the driver is arrested. As discussed *supra*, Defendant was passed out inside a running vehicle stopped at the intersection of Red Bridge and Grandview Road. He and Mr. Love were transported to the hospital for medical evaluation leaving his vehicle illegally parked at the intersection – creating a traffic hazard for other drivers. Prior to towing the vehicle, officers conducted an inventory search pursuant to their standardized police procedures and discovered a firearm. As such, the undersigned recommends a finding that no constitutional violation occurred.

### b.    Automobile Exception

Assuming *arguendo*, KCPD's tow policy did not justify the search of Defendant's vehicle, the officers had probable cause to search the vehicle pursuant to the automobile exception. "Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016); *see also Illinois v. Gates*, 462

18

U.S. 213, 238 (1983).  Further, it is well established that the odor of marijuana emanating from a vehicle "provides probable cause for a warrantless search of a vehicle under the automobile exception."  *United States v. Merrett*, 8 F.4th 743, 751 (8th Cir. 2021); *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020); *United States v. Smith*, 789 F.3d 923, 928-29 (8th Cir. 2015). Upon his arrival, Officer Mogilnicki smelled marijuana emanating from Defendant's vehicle.  He observed an ashy residue on top of a soda can.  He observed the occupants of the vehicle who appeared to be passed out and likely under the influence.  Pursuant to the automobile exception, the officers had probable cause to search the vehicle and its contents.   The undersigned recommends a finding that the search of the vehicle was also justified under the automobile exception to the Fourth Amendment warrant requirement.

**C.**     **Motion to Suppress Statements**[22]

**1.**     ***Miranda* Rights**

The United States Constitution protects individuals from self-incrimination.  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court "adopted a set of prophylactic measures designed to safeguard th[is] constitutional guarantee…."  *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011).   Before a suspect in custody is questioned, law enforcement must warn him that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444.  These warnings are "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere."  *Id*. at 468, 471.

---

[22] Defendant's Motion to Dismiss Statements (Doc. 93) requests relief more appropriately phrased as a motion to suppress statements.  As such, the Court considers the motion under the appropriate standard.

## 2.    Waiver of *Miranda* Rights

An "accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *Miranda*, 384 U.S. at 444. Courts apply a two-part inquiry to determine whether the accused waived his or her *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (often referred to as a "knowing and intelligent" waiver).

When determining whether the accused's waiver was valid, courts examine the "totality of the circumstances" surrounding the interrogation. *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Courts have recognized a variety factors in assessing the voluntariness of waiver, including but not limited to the accused's age, intelligence, and education; whether the accused consented after receiving *Miranda* rights; whether the accused suffered from mental impairments; the length of time the accused was detained and questioned; whether the accused was without counsel when questioned; whether law enforcement made promises or misrepresentations; and whether the accused, due to prior arrests, was aware of the rights and protections afforded by the legal system. *See*, *e.g.*, *United States v. Vinton*, 631 F.3d 476, 481-83 (8th Cir. 2011) (citation omitted); *United States v. Larry*, 126 F.3d 1077, 1079 (8th Cir. 1997); *United States v. Kime*, 99 F.3d 870, 880 (8th Cir. 1996). The Government must prove by a preponderance of the evidence that a defendant's waiver was both voluntary and knowing and intelligent. *Berghuis*, 560 U.S. at

382-85; *see also United States v. Figueroa-Serrano*, 971 F.3d 806, 814 (8th Cir. 2020) (citations omitted).

Defendant argues his "fifth amendment constitutional right's [sic]" were violated because at the time of his custodial interview he was "under the influence of such [a] powerfull [sic] drug (PCP)." Doc. 93 at 1. He contends he "should of [sic] been gave [sic] enough time for [his] high to come down before [he] was ever questioned by any law enforcement officer." *Id*. Despite these initial arguments, Defendant, in his reply, states he filed his "Motion to Dismiss Statement's [sic] as a reverse psychology defense statigy [sic]" and "only stated that he was under the influence because [he] knew that the government would deny that [he] was, just so they could use [his] statement's [sic] at the suppressing [sic] hearing or trial." Doc. 106 at 1.

The Government argues Defendant "was fully informed of his *Miranda* rights by a law enforcement official before the interrogation, and as captured on the video recording, he intelligently, knowingly, and voluntarily waived those rights." Doc. 95 at 6. Relying on the videorecording of the interview and Detective Manley's observation, the Government contends Defendant did not appear "to be suffering from drug intoxication or any mental impairment when he waived his rights." *Id*.

### (a)    Voluntariness of Waiver

A waiver of Fifth Amendment privilege is considered voluntary unless there is evidence the individual's will was overborne and his or her "capacity for self-determination" was critically impaired due to the actions of law enforcement. *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (quoting *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986)); *see also Moran*, 475 U.S. at 421 (holding a statement must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception."). Defendant does not argue the agents threatened or coerced him and does

not allege his mental capacity to make his own decisions was critically impaired due to the agents' actions. *See* Doc. 93.

Instead, Defendant argues he should not have been questioned while under the influence of PCP. However, intoxication does "not automatically render a confession involuntary." *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) (citations omitted). Instead, the test is whether a mental impairment "caused the defendant's will to be overborne." *Id*. Even assuming Defendant *was* under the influence of PCP and setting aside the representation in his reply that he was not under the influence of PCP, the evidence adduced at the suppression hearing demonstrates Defendant's will was not overborne. Defendant advised Detective Manley that he was "not under the influence" of PCP and had not used PCP since 2003. Further, the evidence before the Court demonstrates Defendant's speech was clear, he appeared calm and lucid, he was able to articulate identifying information, and his thoughts appeared rationale at the time of the interview. There is nothing on the videorecording of the interview to suggest that Defendant suffered from impairment or that his will was overborne. Accordingly, the undersigned recommends the Court find Defendant's waiver was voluntary.

### (b)     Knowing and Intelligent Waiver

In addition to being voluntary, a waiver of *Miranda* rights must be knowing and intelligent. *Fare*, 442 U.S. at 724-25. The *Miranda* warnings ensure a waiver is knowing and intelligent by requiring the suspect to be fully advised of the constitutional privilege against self-incrimination. *Spring,* 479 U.S. at 574. A knowing and intelligent waiver is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Castro-Higuero*, 473 F.3d 880, 885-86 (8th Cir. 2007) (citation omitted).

Defendant does not argue, nor can an argument be made, that he was not fully aware of the rights he abandoned, and the consequences of abandoning those rights. Defendant was presented with the Miranda waiver form, followed along while Detective Manley fully and completely read the waiver form aloud, and verbally confirmed with the detective that he understood his *Miranda* rights. In fact, Detective Manley stated on two separate occasions that he wanted to make sure Defendant understood the form and his rights. Defendant, being fully apprised of his *Miranda* rights, then signed the waiver and voluntarily spoke with Detective Manley. Accordingly, the undersigned recommends a finding that Defendant's waiver was knowing and intelligent.

D.    **Motion to Dismiss Charges**

Defendant contends in his motion to dismiss charges that officers improperly obtained evidence in violation of the Fourth and Fourteenth Amendments to support of the "accusatory instrument." Doc. 100 at 1. This argument, however, repeats the same arguments Defendant advanced in his motion to suppress. As discussed *supra*, the officers were justified in every aspect of their encounter with Defendant and did not violate his Fourth Amendment rights.

Defendant also contends the Government gave "false evidence to the courts" and to the grand jury, claiming the initial weight of the alleged PCP was inaccurate. Doc. 100 at 2. This argument, however, is foreclosed by case law that conclusively establishes a challenge to the reliability or competence of evidence supporting a grand jury's probable cause finding will not be heard. *See Kaley v. United States,* 571 U.S. 320, 328 (2014) (recognizing "[t]he grand jury gets to say—without any review, oversight or second-guessing—whether probable cause exists to think that a person committed a crime."); *Costello v. United States,* 350 U.S. 359, 363 (1956) (observing that a criminal defendant is not entitled to a preliminary trial to determine the competency and adequacy of the evidence before a grand jury); *see also United States v. Sholley-Gonzalez*, 996

23

F.3d 887, 893 (8th Cir. 2021).  The grand jury's probable cause determination is conclusive.  *Kaley,*
571 U.S. at 330-31.

For the reasons discussed *supra*, the undersigned recommends the court enter an order
denying Defendant's Motion for Leave to Dismiss Charges (Doc. 100).

## IV.    CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and
applicable law, enter an order DENYING Defendant's Motion to Suppress (Docs. 84) and Motions
to Dismiss (Docs. 93, 100[23]).

Counsel and Defendant are reminded they have fourteen days in which to file any
objections to this Report and Recommendation.  A failure to file and serve objections by this date
shall bar an attack on appeal of the factual findings in this Report and Recommendation except on
the grounds of plain error or manifest injustice.

DATE: August 22, 2022                               */s/ W. Brian Gaddy*
                                                    W. BRIAN GADDY
                                                    UNITED STATES MAGISTRATE JUDGE

---

[23] As discussed *supra*, Defendant's reply in support of his Motion for Dismiss Statements was filed as a motion in the
Court's docketing system.  *See* Doc. 106.  Accordingly, the undersigned would also recommend the Court enter an
order denying his Reply.